UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHERYL F.,[1]

                                        Plaintiff                    DECISION and ORDER

-vs-                                                                 1:22-CV-00958-CJS

COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.
_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Supplemental Security Income ("SSI") benefits.   Plaintiff maintains that such determination is affected by errors of law and not supported by substantial evidence, primarily since the ALJ erred both in finding that her depression and anxiety were not severe impairments, and in not finding that she was entitled to a closed period of disability while she recovered from spinal surgery.   Now before the Court is Plaintiff's motion (ECF No. 7) for judgment on the pleadings and Defendant's cross-motion (ECF No.10) for the same relief.   For reasons discussed below, Plaintiff's application is denied, Defendant's application is granted, and this matter is dismissed.

## STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential

_____

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

evaluation process:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment[2] which significantly limits his physical or mental ability to do basic work activities.[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[4] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[5]

---

[2] "At step two, the ALJ must determine whether the claimant has a 'severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement.' *Id*. If not, the claimant is deemed not disabled, and the inquiry ends." *Koch v. Colvin*, 570 F. App'x 99, 101 (2d Cir. 2014); *see also*, 20 C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.").

[3] The Commissioner's Regulations define basic work-related activities as follows: "Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include— (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."   20 C.F.R. § 404.1522 (West 2023).

[4] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[5] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert [("VE")]. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

3

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Snyder v. Comm'r of Soc. Sec.*, No. 22-277-CV, 2023 WL 1943108, at *1 (2d Cir. Feb. 13, 2023) ("While the substantial evidence standard requires we find more than a mere scintilla of support for the Commissioner's decision, it is still a very deferential standard of review requiring us to uphold the Commissioner's findings unless a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original; citations and internal quotation marks omitted); *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022) ("We may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence'—that is, if no reasonable factfinder could have reached the same conclusion as the ALJ.").

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of

the evidence, but the deferential standard of review prevents us from reweighing it."); *see also,*
*Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007)
("The court does not engage in a *de novo* determination of whether or not the claimant is
disabled, but instead determines whether correct legal standards were applied and whether
substantial evidence supports the decision of the Commissioner.") (citations omitted).   "Even
where the administrative record may also adequately support contrary findings on particular
issues, the ALJ's factual findings must be given conclusive effect so long as they are supported
by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation
marks omitted).   "In other words, this Court must afford the Commissioner's determination
considerable deference, and 'may not substitute its own judgment for that of the [Commissioner],
even if it might justifiably have reached a different result upon a *de novo* review.'" *Melia v. Colvin*,
No. 1:14-CV-00226 MAD, 2015 WL 4041742, at *2 (N.D.N.Y. July 1, 2015) (quoting *Valente v.*
*Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

Also, when considering whether a particular finding or decision is supported by substantial
evidence, a court may not rely on any *post hoc* rationalizations offered by the Commissioner,
but it may consider evidence that was evidently considered by the ALJ even if it was not
expressly mentioned in the administrative decision. *See, Mongeur v. Heckler*, 722 F.2d 1033,
1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of
an ALJ's decision, we do not require that he have mentioned every item of testimony presented
to him or have explained why he considered particular evidence unpersuasive or insufficient to
lead him to a conclusion of disability. *E.g., Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982).
In *Berry*, we noted that, although we would remand for further findings or a clearer explanation

where we could not fathom the ALJ's rationale "in relation to evidence in the record," we would not remand where "we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Id.* *See also Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between the reports of [two doctors], we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony ....")."); *see also*, *Loni S. v. Comm'r of Soc. Sec.*, No. 3:22-CV-805 (CFH), 2023 WL 4195887, at *19 (N.D.N.Y. June 27, 2023) ("The Court is required to look at the entire ALJ's decision when reviewing for substantial evidence. *See John L. M. v. Kijakazi*, No. 5:21-CV-368 (BKS/TWD), 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022) (citations omitted) ('[W]hile a reviewing court may not affirm the Commissioner's decision based on an impermissible *post-hoc* rationalization, it may affirm where the ALJ's consideration of the relevant factors can be gleaned from the ALJ's decision as a whole.').").

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action, which is set forth in the parties' papers.

Briefly, Plaintiff was born in 1975 and earned her GED degree.   Plaintiff had no reported earnings between 2010 and 2017, though she does not claim to have been disabled during this period. Tr. 289, 320.   Although, Plaintiff was steadily taking opioids and benzodiazepines (Norco and Clonazepam) for pain and anxiety, prescribed by her primary care physician, Michael Calabrese, M.D. ("Calabrese").[6]

In March 2017, Plaintiff had back surgery, consisting of a posterior L4-S1 decompression

---

[6] *See, e.g.*, Tr. 1301 ("She has [taken] opioid pain medications for pain control off and on about 15 years[.]").

with instrumented fusion, to relieve symptoms of spondylosis with radiculopathy, intervertebral disc disorder with radiculopathy lumbar region, and lumbago with sciatica.   Plaintiff had some relief from the surgery, and in 2018 went to work as a housekeeper and health care aide for a relatively brief period, with reported earnings of approximately $5,000.00.[7]   However, she claimed that her back pain increased with "prolonged sitting," purportedly because "part of the last surgery never fused." Tr. 533.[8]

In November 2018, Plaintiff had further spinal surgery to revise the prior surgery. Tr. 443-444.   The surgery was successful in terms of the revision, Tr. 861-863, and her surgeon, Edward Simmons, M.D. ("Simmons"), urged her to gradually increase her activity and decrease her use of her back brace. Tr. 870.   Simmons opined that Plaintiff would probably not be able to return to her work as a housekeeper, and would need a more sedentary type of work.[9] Plaintiff, though, continued to complain of pain and to request additional pain medication. Tr. 855, 868, 1138, 1200, 1220.

On April 15, 2019, approximately five months after Plaintiff's surgery, Dr. Calabrese completed an "employability assessment" for the New York State Office of Temporary Disability Assistance. Tr. 1254-1255.   Calabrese indicated that Plaintiff's conditions were "anxiety," "chronic pain," "l/s [lumbosacral] disc disease," and "cervicalgia." Tr. 1254.   When asked to rate

---

[7] This was Plaintiff's only period of employment between 2010 and 2019. Tr. 289, 320.

[8] Plaintiff indicated to a consultative examiner that the incomplete fusion occurred because she returned to work too soon, Tr. 886, but there are indications in the record that the problem was related to her continued smoking cigarettes against her surgeon's instructions. See, e.g., Tr. 806, 817, 819, 854.

[9] Tr. 876 ("She is completely disabled with regards to her work and cleaning and her former work as an LPN. Ultimately a more sedentary type of job would be appropriate for her."). In May 2019, Dr. Simmons indicated that Plaintiff was "temporarily totally disabled with regards to all work" and would remain so until he re-evaluated her in November 2019, Tr. 800, but Plaintiff apparently stopped seeing Simmons in or about May 2019, and consequently was not later re-evaluated by him. See, Tr. 1259 (Office note by Dr. Calabrese dated 12/6/19: "She has not made a recent f/u [follow up] with Dr. Simmons for reevaluation.").

Plaintiff's functional limitations, Calabrese indicated that she was permanently "moderately limited" for most physical work-related functioning, and more specifically stated that the following work activities were "contraindicated": "prolonged standing/walking; [no] kneeling, climbing, stooping; [no] lifting [greater than] 15 lbs [with] [bilateral] hands/shoulders." Tr. 1255.   Calabrese stated, however, that there was "no evidence" that Plaintiff had any mental limitations for work functions. Tr. 1255.

The following day, April 16, 2019, Plaintiff applied for SSI benefits, initially claiming to be disabled as of January 1, 2017, due to "diabetes, high cholesterol, high blood pressure, anxiety, depression, diabetic nerve pain, spinal stenosis and back surgery." Tr. 291, 318.   Plaintiff later amended the disability onset date to April 4, 2019. Tr. 394.

On May 16, 2019, Dr. Simmons indicated that Plaintiff remained "temporarily totally disabled with regards to all work" while recovering from surgery, and that such restriction would "remain in effect until [she was] re-evaluated on 11/28/2019." Tr. 800.   However, Plaintiff stopped treating with Simmons prior to that date, and consequently Simmons provided no further post-surgery evaluation of her ability to return to work.

On June 21, 2019, Nikita Dave, M.D. ("Dave") performed a consultative internal medication examination of Plaintiff at the Commissioner's request. Tr. 886-889.   Plaintiff told Dave that she had "no improvement in terms of the pain after the second surgery," and that her pain was "intermittent, brought on by sudden movements, such as twisting and turning, also prolonged standing or lying. . . .   [with] occasional spontaneous mild aching [from her neck]." Tr. 886.   Plaintiff told Dave that she did not use street drugs, but that was not true, as discussed further below. Tr. 887, 1298, 1302, 1306.   Dave examined Plaintiff and reported that she

appeared to be in no acute distress; was able to rise from her chair without difficulty; needed no help getting on and off the examining table; used no assistive device; was able to perform a half squat; had full range of motion in the neck, hips, shoulders, knees, ankles, elbows, forearms and wrists; declined movement of the lumbar spine; had mild tenderness in the thoracic and lumbo-sacral spines; had full strength in the upper and lower extremities; and had full hand strength and dexterity bilaterally. Tr. 887-888. Dave's medical source statement was as follows:

> In terms of the lumbar spine, due to redo surgery, the claimant currently remains under strict surgical restrictions with Dr. Simmons. These are deferred to his office. No limitations for the cervical spine. With regard to diabetic neuropathy affecting the feet, avoid ladders and unprotected heights. There may be mild to moderate limitations for prolonged standing, prolonged walking, heavy lifting and carrying due to the feet.

Tr. 889.

On June 21, 2019, Gregory Fabiano, Ph.D. ("Fabiano") performed a consultative psychiatric evaluation of Plaintiff at the Commissioner's request. Tr. 880-884. Plaintiff told Fabiano that she had no history of psychiatric hospitalizations and no current outpatient mental health treatment, and that she had stopped working in October 2019 not because of mental health symptoms, but because her "back gave out." Tr. 880. In that regard, Plaintiff reported that her "difficulties [were] because of her neck and back problems," and that she "can't bend." Tr. 882. Plaintiff also reported difficulty falling asleep and staying asleep; depression; agitation; hopelessness; irritability; loss of usual interest; diminished pleasure; social withdrawal; "panic" in response to things such as strange noises in her house; short-term memory deficits; excessive worry; palpitations; sweating; breathing difficulties; and trembling. Tr. 880. However, Plaintiff specifically denied any loss of appetite, phobic responses, post-traumatic stress disorder

("PTSD"), mania, or thought disorder. Tr. 881.

Upon examination and testing, Fabiano reported no negative findings, other than that Plaintiff claimed to be in an "antsy mood."  More specifically, Fabiano found that Plaintiff was cooperative and well groomed, with adequate social skills and eye contact; that she had coherent and goal-directed thought processes with no evidence of hallucinations, delusions or paranoia; and that she had full affect, appropriate speech and thought content, intact attention and concentration, intact recent and remote memory, average cognitive functioning, appropriate fund of information, good insight, and good judgment. Tr. 881-882.  Fabiano's mental diagnoses were "major depressive disorder, recurrent episodes, moderate, unspecified anxiety disorder," and he recommended that Plaintiff begin mental health treatment and vocational rehabilitation. Tr. 883.  Fabiano's medical source statement indicated that Plaintiff did not appear to have any limitations on her ability to perform most of the mental aspects of work, including sustaining an ordinary routine and regular attendance at work, but that she "appear[ed] to have moderate limitations in the ability to interact adequately with supervisors, coworkers, and the public and regulate emotions, control behavior, and maintain well-being, difficulties are caused by mental health symptoms." Tr. 883.

Agency review physician Lisa DeKeon, Ph.D. ("DeKeon") subsequently opined that Plaintiff's mental impairments were "not severe." Tr. 1246-1247

Eventually, in or about the Summer of 2019, Dr. Simmons declined to prescribe Plaintiff any further pain medications, and Dr. Calabrese declined to prescribe her any further pain or mental health medications.[10]  Evidently, this was because of Plaintiff's long history of using

---

[10] *See*, Tr. 1200-1201 ("She is over 3 months post op, [Dr. Simmons] is no longer prescribing her pain

prescription pain and anxiety medications (opioids and benzodiazepines) along with her admitted use of street drugs including marijuana, cocaine, and benzodiazepines obtained from other people. *See, e.g.*, Tr. 1301 ("She has [taken] opioid pain medications for pain control off and on about 15 years, continually during past 2 years until this August. [2019]   She was on Norco . . . for her pain control.   However, her previous physician is not comfortable to prescribe her Norco.  . . .   She recently took cocaine to relieve her pain.  . . .   She also occasionally takes Norco from other[s] if she has no pain killers available.").

In August 2019, shortly after her SSI claim was initially denied, Plaintiff began mental health treatment with Horizon Health Services ("Horizon"), apparently in response to Dr. Calabrese's decision to stop prescribing her benzodiazepines. Tr. 1273.   In contrast to the limited symptoms that she had previously reported to Dr. Fabiano, Tr. 880-881, Plaintiff reported a much longer list of mental health symptoms to Horizon, including hallucinations,[11] insomnia, suicidal ideation, PTSD, and periods of manic bipolar activity, for which Horizon staff prescribed her medications including a benzodiazepine, Clonazepam, for anxiety. Tr. 1226-1228, 1280. Although, the mental status examinations performed at Horizons were essentially unremarkable. See, e.g., Tr. 1237-1238, 1276-1277, 1328.   Horizon eventually terminated Plaintiff as a client after she failed to appear for appointments.

In or about October 2019, following the decisions by Simmons and Calabrese to cease prescribing pain medications to Plaintiff, she began treating with pain management specialist Dr.

---

medications so needs to resume from our office.  . . .   Goal to taper down as [symptoms] allow"); 1262 (Noting that pain "Rx was discontinued").

[11] Plaintiff did not report any hallucinations to Fabiano, but three months later she told Horizon staff that "she continued to see a shadow man that came and went." ECF No. 7-1 at p. 5.

Gary Wang, M.D. ("Wang"), who diagnosed her with "opioid use, unspecified with opioid-induced mood disorder," as well as spinal instabilities, cocaine use, cannabis use, postlaminectomy syndrome, and low back pain. Tr. 1303.   Wang consistently noted, regarding Plaintiff's mood, that she denied being depressed but often reported having anxiety. *See, e.g.*, Tr. 1429 ("No feeling depressive.   She reported anxiety often.").

Toxicology screens by Wang showed that Plaintiff continued to use marijuana, cocaine and opioids. Tr. 1298, 1302, 1306.[12]   However, Wang eventually reported success in weaning Plaintiff off her reliance on opioids and benzodiazepines, with resulting improvements in mood and reductions in pain and anxiety. Tr. 1295 ("There is no severe anxiety.   . . .   She has not taken Clonazepam recently.   . . .   She has not taken any opioid pain killer recently.   Plan to keep her avoiding any unnecessary opioids.   . . .   Discontinued Clonazepam today.   Plan to avoid unnecessary Benzos.   Plain to gradually simplify the medication."); Tr. 1293 ("She also reported less anxiety, her pain became more tolerable; however, she still reported exacerbation of the pain intermittently. She reported she has more pain today.   The pain is the same pattern in the mid back & upper back.   Her lower back pain is much less than before.   She reported she continues to perform SI joint pain exercises that are significantly helpful for part of the lower back pain; however, the patient still reports diffused multiple achy type of pain.   She agreed she is much less emotional than before for her pain but she still feels she needs some stronger pain medication due to the pain exacerbation sometimes.").

In that regard, Wang indicated that to some unspecified degree, Plaintiff's previously-

---

[12]  Also, on December 6, 2019, Plaintiff obtained a temporary prescription of pain medications from Dr. Calabrese, who had previously stopped prescribing them to her, after telling him that Dr. Wang wasn't providing her with adequate pain relief. Tr. 1259.

reported pain and anxiety had been related to her over-use of opioids and benzodiazepines. *See, e.g.*, 1423 ("Patient demonstrated . . . possible opioid prolonged use related unspecific multiple pains.   I had a prolonged discussion with the patient and provided the patient education and counseling.   The patient reported better control of her pains.   The current treatment strateg[y] seems helpful for her pain control.   Planned to continue to avoid all opioids or Benzo.").

Notably, Wang also opined that Plaintiff was not physically disabled from working, contrary to what she told him, and that it would be beneficial for her to return to work. Specifically, Wang stated:

> The patient raised questions about her disability-related issues.   She [reports that she][13] has not been able to work in the past 10 years due to pain and anxiety. She currently has successfully weaned off opioids and Benzos, with better pain control and functional status physically.   I pointed out that she is not totally disabled physically.   I recommended her to start light job training.   One of the important goals of chronic pain management with rehab service is to let the patient return to work force as soon as possible.   However, I also disagreed that her mood status should interfere with her work capability.   I think that should be decided by her psychiatrist or psychologist.   I encouraged her to continue to follow up with her psychiatrist.

Tr. 1429; *see also*, Tr. 1423 ("Encouraged her to participate in work-oriented exercises.").

After Plaintiff's claim was denied initially and on reconsideration, she had a hearing before ALJ Dale Black-Pennington ("the ALJ"), at which she and a VE testified. Tr. 23.   On June 9, 2021, the ALJ issued a Decision (Tr. 23-39) finding that Plaintiff was not disabled at any time between the alleged onset date and the date of her decision.   The ALJ conducted the five-step

---

[13] Since Wang was not treating Plaintiff during that period he evidently was reporting what she told him.

13

sequential evaluation and found, in pertinent part, that Plaintiff had severe impairments consisting of "post laminectomy syndrome, degenerative disc disease lumbar spine, type II diabetes mellitus with neuropathy,[14] bilateral carpal tunnel syndrome and obesity"; that Plaintiff also had non-severe impairments including high cholesterol, hypertension, anxiety, and depression; that those impairments, either singly or combined, did not meet or medically equal a listed impairment; that Plaintiff had,

> the residual functional capacity to perform light work . . . except [she] can lift and/or carry 15 pounds occasionally and 10 pounds frequently; can stand and/or walk for six hours and sit for six hours in an eight-hour workday; able to frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds; frequently balance; occasionally stoop, kneel, crouch and crawl; must avoid unprotected heights, heavy moving mechanical parts/machinery and industrial vibrations; not able to work at strict production pace; able to perform frequent but not constant fine and gross manipulation with bilateral upper extremities; and requires use of a cane to ambulate[;][15]

that Plaintiff had no past relevant work; that with the aforementioned RFC, Plaintiff could perform other work, namely, the jobs of ticket taker, garment sorter, and laundry sorter; and that Plaintiff was therefore not disabled.

At step two of the sequential evaluation, the ALJ provided a lengthy explanation for why she had concluded that Plaintiff's depression and anxiety were not severe impairments, Tr. 26-30, after finding "no evidence to support a finding those th[o]se conditions cause any more than minimal, if any, limitations in the claimant's ability to perform basic . . . mental work-related functions." Tr. 26.   The ALJ noted, for example, that although Plaintiff reported a history of

---

[14] Plaintiff has a long history of poorly-controlled insulin-dependent diabetes. Tr. 453 (ER visit for high blood sugar).
[15] Tr. 30-31.

anxiety, "prescribed medications improved her symptoms," and "[u]pon examination, she consistently appeared pleasant, cooperative, and fully alert." Tr. 26.   The ALJ further noted that when Plaintiff began treatment with Horizon, she reported "significant" mental health symptoms, but that "mental status evaluation" showed essentially normal results, including euthymic mood with congruent affect, appropriate thought content, normal speech, logical thought processes, normal cognitive status, and fair insight and judgment. Tr. 26-27.   The ALJ further noted that although Plaintiff reported certain instances of symptom exacerbation to Horizon in 2020, it was during periods in which she either had been "off medications for a couple months, which she believed contributed to her anxiety and . . . mood instability," or in which she had stopped attending therapy sessions. Tr. 27.   The ALJ indicated that when Plaintiff subsequently resumed treatment, she reported fewer symptoms, and that those she reported were generally related to discrete events such as the anniversary of her mother's death. Tr. 27.   The ALJ further noted that in October 2019, Dr. Wang had indicated that Plaintiff's mood disorder was opioid-induced. Tr. 27.

The ALJ also discussed the opinion of long-time treating physician Dr. Calabrese, that Plaintiff had no mental limitations on her ability to work, finding it persuasive and consistent with the other evidence. Tr. 28.   The ALJ further found Dr. Fabiano's consultative opinion generally persuasive and consistent, though she found his opinion that Plaintiff would have moderate limitations to be not persuasive and inconsistent with the treatment records and with his own examination. Tr. 29 ("However, moderate limitations of functions are not persuasive, inconsistent with treatment records and internally inconsistent with [his] own examination.").

Further, the ALJ cited the opinions of state agency review physicians that Plaintiff's

mental impairments were not severe. Tr. 29.

Finally, in concluding her step-two discussion, the ALJ evaluated Plaintiff's mental impairments under "the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders," "the paragraph B criteria," and found that she had no limitation in understanding, remembering or applying information, mild limitation in interacting with others, mild limitation in concentrating, persisting or maintaining pace, and mild limitation in adapting or managing oneself, which supported a finding of non-severity. *See*, Tr. 30 ("Because the claimant's medically determinable mental impairments cause no more than 'mild' limitations in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 416.920a(d)(1).").   Before proceeding on to the subsequent steps of the sequential evaluation, the ALJ stated, "The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." Tr. 30.

Further, regarding her subsequent RFC finding, the ALJ expressly noted that in making such finding she was required "consider all of the claimant's impairments, including impairments that are not severe," and that she had "considered all symptoms." Tr. 25, 31.

Specifically, regarding her consideration of Plaintiff's severe "back surgery" impairment when making her RFC finding, the ALJ reviewed the post-operative treatment records (Tr. 32-34) and noted, for example, that in October 2019, Plaintiff reportedly "maintained full active range of motion, functional muscle strength in all limbs, no focal motor deficits and negative straight leg raising bilaterally." Tr. 33.   The ALJ also discussed Dr. Calabrese's opinion, issued on April

15, 2019, that Plaintiff had only moderate limitations with walking, standing, sitting, lifting, carrying, pushing, pulling, bending, climbing and using her hands, and that she could lift no more than 15 pounds, finding the opinion "most persuasive and interpreted as [meaning that Plaintiff had the] ability to perform light exertional work activities." Tr. 35-36.

Also, in pertinent part, the ALJ discussed Dr. Simmons' opinion, dated May 16, 2020, that Plaintiff was "temporarily totally disabled with regards to all work," which was to remain in effect until November 28, 2019, and found that the opinion was "mostly persuasive, as [the] restrictions addressed appear to be standard postoperative restrictions," but that it "d[id] not meet the twelve-month durational requirements." Tr. 36.

Finally, the ALJ observed that the opinions of the "state agency physical physicians," dated July 18, 2019, and October 25, 2019, respectively, "opin[ing] that the claimant is able to perform light exertional work activities" with additional postural limitations, were "generally persuasive, consistent with the record and supported by other opinion evidence." Tr. 37.

Plaintiff, though, maintains in this action that the ALJ's decision must be reversed for the following reasons: 1) the ALJ erred in finding that her depression and anxiety were non-severe impairments; 2) the ALJ erred by failing to demonstrate that she considered the impact of all Plaintiff's impairments, severe and non-severe combined, when making her RFC finding; 3) the ALJ erred by rejecting the portion of Dr. Fabiano's opinion indicating that Plaintiff would have moderate limitations resulting from her mental impairments; and 4) the ALJ erred by failing to consider a closed period of disability following Plaintiff's spinal surgery.

Defendant disagrees and insists that the ALJ's decision is free from error and supported by substantial evidence.

17

The Court has considered the parties' submissions, including Plaintiff's reply, and the entire administrative record.

DISCUSSION

Plaintiff first maintains that the ALJ erred in finding that her depression and anxiety were non-severe impairments at step two of the sequential evaluation.   Plaintiff contends that the ALJ's finding is unsupported by substantial evidence, since "the record demonstrate[s] that she frequently reported significant symptoms related to both conditions, that she sought treatment for both conditions, and that she was consistently medicated for both conditions."[16]   Plaintiff further argues that "the ALJ's own lengthy discussion at step two *demonstrates* that Plaintiff's anxiety and depressions were more than "slight abnormalities' and that they had more than a minimal effect on her ability to work."[17]   Plaintiff insists that the most likely explanation for why the ALJ failed to find the mental impairments severe is that, she knew if she did she would have to find Plaintiff disabled.[18]

However, the Court disagrees.   Plaintiff's argument boils down to a disagreement with how the ALJ weighed the evidence,[19] premised on the idea that the ALJ was required to accept her subjective descriptions of her mental health symptoms.   However, the question is not whether Plaintiff complained of symptoms and sought treatment, or even whether medical

---

[16] Pl. Memo of Law, ECF No. 7-1 at p. 14.

[17] Pl. Memo of Law, ECF No. 7-1 at p. 15 (emphasis added).

[18] Pl. Memo of Law, ECF No. 7-1 at pp. 15-16 ("[I]t is entirely unclear why the ALJ found that Plaintiff's anxiety and depression were non-severe – unless she believed that adding the appropriate limitations in the RFC to account for severe impairments of anxiety and depression would preclude employment and necessitate a finding of disabled."   The Court finds this reasoning generally unpersuasive on its face since ALJs frequently find that claimants with severe mental impairments are not disabled.

[19] Indeed, Plaintiff expressly argues that the ALJ's decision finding her anxiety and depression "non-severe" is "against the weight of the evidence." Pl. Memo of Law, ECF No. 7-1 at p. 15 ("This finding is plainly against the weight of the evidence of record.").

providers prescribed her medications (apparently based solely on her subjective complaints); rather, it is whether her anxiety and depression were more than slight abnormalities that would have no more than a minimal effect on her ability to work.   The ALJ's negative finding on that point is supported by substantial evidence, including the opinion of Plaintiff's own long-term primary care physician, Dr. Calabrese, that Plaintiff had no limitations on her mental ability to perform work functions,[20] and the opinions of two state agency psychiatric consultants that her anxiety and depression were not severe impairments.   Plaintiff, meanwhile, has not shown that a reasonable factfinder would be compelled to find that her anxiety and depression were severe impairments.

Beyond just supporting her finding with substantial evidence, the ALJ provided a careful, well-reasoned explanation for her step-two finding.   Plaintiff attempts to counter this fact by arguing that a lengthy discussion by an ALJ at step two actually proves that a claimant's impairment is severe, but the Court finds this argument unpersuasive, in general and in this particular case.

Plaintiff next contends that the ALJ failed to properly consider all evidence of her impairments, severe and non-severe, at the later steps of the sequential evaluation, referring to an alleged failure to consider evidence of her anxiety and depression in the RFC finding. Building on her first argument, Plaintiff essentially maintains that if the ALJ had properly considered all the evidence at the later steps, she necessarily would have included additional non-exertional limitations in the RFC finding to account for her anxiety and depression.

---

[20]  There is also the fact that Plaintiff's mental impairments did not previously prevent her from working, and that there is no evidence that her anxiety and depression subsequently worsened after she stopped working purportedly due to physical impairments, other than her own inconsistent statements.

However, the Court again disagrees.

Of course, Plaintiff is correct that an ALJ's RFC finding must take into account the combined effect of all the claimant's impairments, severe and non-severe.   However, Plaintiff has not shown that the ALJ failed to do so here.   As a preliminary matter, and as Plaintiff acknowledges,[21] the ALJ did, in fact, briefly refer to Plaintiff's mental health conditions several times in her discussion explaining her RFC finding[22]

Moreover, and more explicitly, the ALJ stated, at the conclusion of her very-thorough step two discussion, that "the *following functional capacity assessment* reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." Tr. 30 (emphasis added).   From that discussion, the Court can certainly glean the ALJ's rationale for not including additional limitations in the RFC finding to account for Plaintiff's anxiety and depression.   Consequently, the error, if any, by the ALJ in failing to provide a more thorough discussion of Plaintiff's anxiety and depression as part of her RFC finding was harmless. *See, McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) ("As the Commissioner concedes, the Step Four residual functional capacity finding did not explicitly include McIntyre's non-exertional functional limitations. However, Step Four findings need only 'afford[ ] an adequate basis for meaningful judicial review, appl[y] the proper legal standards, and [be] supported by substantial evidence such that additional analysis would be unnecessary or superfluous[.]' *Cichocki*, 729 F.3d at 177.").

---

[21] Pl. Memo of Law, ECF No. 7-1 at p. 17 ("[T]he ALJ failed to *adequately* consider Plaintiff's anxiety and depression – whether severe or non-severe—in the RFC assessment.   Indeed, the ALJ *hardly* addressed them at all past step two.") (emphasis added).
[22] *See, e.g.*, ALJ's Decision, Tr. 34 at lines 22-26, 33, 35; Tr. 35 at lines 5-7; Tr. 37 at lines 10-11.

Also, the ALJ expressly stated, with regard to her RFC finding, that she was required to "consider all of the claimant's impairments, including impairments that are not severe," and that she had "considered all symptoms." Tr. 25, 31.   Plaintiff maintains that those statements are disproven by the ALJ's failure to include additional limitations in the RFC finding, but, again, this amounts to a disagreement with how the ALJ weighed the evidence.   Plaintiff has not shown that reasonable factfinder would have to conclude that the RFC finding should have included additional limitations related to her anxiety and depression.

Neither has Plaintiff shown that mild mental impairments require an ALJ to include specific provisions in the RFC finding. *See, e.g., Kendra C. v. Commissioner*, No. 21-CV-1131MWP, 2024 WL 1242413 at *10 (W.D.N.Y. Mar. 22, 2024) ("Although an ALJ must account for limitations caused by both severe and nonsevere impairments in formulating the RFC, if a mental impairment causes only mild limitations that do not result in any functional work-related restrictions, the ALJ does not necessarily err by formulating an RFC without mental limitations or restrictions.").

Plaintiff next contends that the ALJ erred by failing to adopt Dr. Fabiano's consultative opinion that Plaintiff ""appear[ed] to have moderate limitations in the ability to interact adequately with supervisors, coworkers, and the public and regulate emotions, control behavior, and maintain well-being." Tr. 883.   Again, the Court disagrees.

On this point, Plaintiff first argues that the ALJ was required to adopt Fabiano's moderate limitations since "[t]he record does not contain an opinion from any treating mental health professional that conflicts with Dr. Fabiano's assessment," indicating that the ALJ must have

based her finding "on nothing more than her own lay interpretation of the medical evidence."[23] However, the factual premise of this argument is incorrect, since although Plaintiff's longtime primary care physician, Dr. Calabrese, may not be a psychiatrist or psychologist, he nevertheless treated her mental health for many years by prescribing her medications for her anxiety and depression, and he stated that she had no mental limitations on her ability to perform work functions, contrary to what was stated by Dr. Fabiano, who examined Plaintiff once.

The Court also rejects Plaintiff's legal argument on this point, since an ALJ's RFC finding need not mirror any single medical opinion. *See, Davis v. Kijakazi*, No. 21CV8485VECBCM, 2023 WL 5726054, at *12 (S.D.N.Y. Aug. 18, 2023) ("Regardless of how many medical source statements the ALJ receives – or the weight he assigns to them – the determination of the claimant's RFC is reserved to the ALJ, who is not required to accept, or follow, any one medical opinion. *See Camille v. Colvin*, 652 F. App'x 25, 29 n.5 (2d Cir. 2016) (summary order) ("An ALJ may accept parts of a doctor's opinion and reject others."), report and recommendation adopted sub nom. *Davis v. Comm'r of Soc. Sec.*, No. 21-CV-8485 (VEC), 2023 WL 5723011 (S.D.N.Y. Sept. 5, 2023).   The issue for the Court, rather, is whether the ALJ's RFC finding is supported by substantial evidence. *See, id*. ("[I]t is the ALJ's prerogative to make an RFC assessment after weighing the evidence and the District Court may not reverse provided there is substantial evidence in the record to support her findings.").

Indeed, an ALJ is not required to adopt every limitation contained in a medical opinion even where, as here, he finds the opinion overall to be persuasive. *See, Kenneth H. v. Comm'r of Soc. Sec.*, No. 1:21-CV-735-DB, 2023 WL 6065026, at *9 (W.D.N.Y. Sept. 18, 2023) ("[T]he

---

[23] Pl. Memo of Law, ECF No. 7-1 at p. 22.

ALJ was not required to wholesale adopt Dr. Lee's opinion solely because it was found to be persuasive, as Plaintiff appears to argue. *See Barry v. Colvin*, 606 F. App'x 621, 624 (2d Cir. 2015) (ALJ's RFC finding need not include every limitation assessed by a consultative examiner, and ALJ could, instead, exercise discretion in reviewing the record evidence in its totality); *see also Fancher v. Comm'r of Soc. Sec.*, No. 19-cv-158 (KS), 2020 WL 5814359, at *5 (W.D.N.Y. Sept. 30, 2020) ("An ALJ is not required to adopt wholesale the opinion of any one medical source, but is entitled to weigh all of the evidence available to make an RFC finding that is consistent with the record as a whole.").

However, where an ALJ makes an RFC finding that conflicts with a medical opinion, the ALJ must explain why the conflicting opinion was not adopted. *See*, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. *If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted*.") (emphasis added).

> Generally, an ALJ must reconcile discrepancies between his or her RFC assessment and medical source statements. SSR 96-8p, 1996 WL 374184, at *7; *see Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006). "If the ALJ's RFC finding conflicts with an opinion from a medical source, the ALJ 'must explain why the opinion was not adopted.'" *Williams v. Colvin*, No. 13-roncv-5431 (RLE), 2015 WL 1223789, at *8 (S.D.N.Y. Mar. 17, 2015) (quoting SSR 96-8p); *accord Garcia v. Berryhill*, No. 17-cv-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018). While an "ALJ is not required to explicitly reconcile every conflicting shred of evidence in the record, an ALJ cannot simply selectively choose evidence in the record that supports [his] conclusions." *Williams*, 2015 WL 1223789, at *8 (cleaned up); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (an ALJ may not "arbitrarily substitute his own judgment for competent medical opinion").

*Lynch v. Commissioner*, No. 22CIV5620CSAEK, 2024 WL 728483, at *11 (S.D.N.Y. Feb. 21, 2024).   Here, though, the ALJ explained why she did not adopt the moderate limitations in Fabiano's report. *See*, Tr. 29 ("Dr. Fabiano's opinion is persuasive in [certain regards]. However, moderate limitations of function are not persuasive, inconsistent with treatment records and internally inconsistent with his own examination.").

Lastly, Plaintiff maintains that the ALJ erred by failing to "consider" whether she was entitled to a closed period of disability following her second spinal surgery in 2018.   Plaintiff indicates that "there are no medical opinions assessing [her] functional abilities related to her lumbar spine between May 2019, when Dr. Simmons opined that [she] was disabled from all work until she was re-evaluated, and December 2020, when Dr. Wang stated generally that [she] was no longer totally disabled,"[24] and that the ALJ therefor improperly either relied on her own lay interpretation of the medical evidence or failed to develop the record to fill the gap of opinion evidence in the record:

> There are no medical opinions assessing Plaintiff's functional abilities related to her lumbar spine between May 2019, when Dr. Simmons opined that Plaintiff was disabled from all work until she was re-evaluated, and December 2020, when Dr. Wang stated generally that Plaintiff was no longer totally disabled. Accordingly, the ALJ had nothing more than her own interpretation of objective medical evidence to determine that Plaintiff was not disabled prior to Dr. Wang's statement (which, on its own, is certainly not substantial evidence to support the RFC finding, given that it includes no functional assessment). Given that in May 2019 Plaintiff's spinal surgeon had restricted her from activities necessary to perform competitive work until at least November 2019, and there are no medical opinions before Dr. Wang's December 2020 to counter that opinion, there is a gap in the record regarding a functional assessment upon which the ALJ could have relied, if she was not going

---

[24] Pl. Memo of Law, ECF No. 7-1 at p. 25.   The Court observes that Dr. Wang did not actually indicate that Plaintiff was "*no longer* totally disabled," as if to indicate that she previously had been disabled.   Rather, he stated only that she was not totally disabled. Tr. 1429 ("I pointed out that she is not totally disabled physically.").

to adopt Dr. Simmons' opinion and find Plaintiff disabled at least until Dr. Wang opined that she was not.

ECF No. 7-1 at p. 25.   Plaintiff essentially argues that the ALJ could not have properly determined whether she was entitled to a closed period of disability without first obtaining an additional medical opinion.

Defendant counters, preliminarily, that Plaintiff should be precluded from making this argument since she never requested a closed period of disability during the administrative proceedings, and, rather, continues to maintain that her condition remained consistent throughout the entire period.   Alternatively, Defendant states that "a review of the decision shows that the ALJ did consider [the question sua sponte], but properly concluded that Plaintiff was not disabled for a closed period."[25]   On this point, Defendant states, in pertinent part:

> [E]ven prior to the application date, in January 2019, Dr. Simmons advised Plaintiff to avoid excessive bending and to not lift more than 15 pounds (Tr. 32, *see* Tr. 863), both in keeping with the ALJ's RFC finding (Tr. 30-31) and undermining Plaintiff's claim she was disabled after the application date. The ALJ discussed that by November 2019 – only seven months after the application date – Plaintiff reported improvements with treatment and home exercises, such that she was able to tolerate more sitting, standing, and household chores. Tr. 33, *see* Tr. 1309; *see also* Tr. 1314 (December 2019 note showing further decreased back pain, less diffuse tenderness, significantly decreased SI joint pain, improved pelvis level, and no apparent gait disturbance). Then, as the ALJ considered, in January 2020, only nine months after the application date, Plaintiff reported only "intermittent" pain and Dr. Wang observed "much less" lower back pain and significant improvement in SI joint pain with treatment. Tr. 33, see Tr. 1293. Accordingly, the ALJ's consideration of Plaintiff's improvements with treatment following back surgery makes clear that he did not find the evidence warranted a closed period of disability.

> Moreover, the ALJ found generally persuasive the prior administrative findings from Drs. Lawrence and Krist, that Plaintiff was capable of light work with postural

---

[25]  Def. Memo of Law, ECF No. 10-1 at p. 21.

> restrictions. Tr. 37, see Tr. 115, 128. These findings were based on the physicians'
> respective reviews of the record, performed in July 2019 and October 2019, and
> which include a review of the evidence covering the period of time during which
> Plaintiff asserts she was disabled. Tr. 115, 128.  . . .  This evidence undermines
> Plaintiff's claim that her impairments were disabling in severity for at least 12
> months after her April 2019 application date, as required.

ECF No. 10-1 at pp. 23-24 (citation omitted).   Defendant also argues that it is incorrect for Plaintiff to assert that the ALJ had to accept Dr. Simmons's post-op opinion that Plaintiff was temporarily totally disabled from her surgery until such time as another doctor stated that she was no longer disabled, first, since questions of disability are reserved to the Commissioner, and second, since the ALJ was not required to rely on any medical opinion in finding that Plaintiff was not disabled.   Finally, Defendant maintains that the evidentiary record was adequately developed.

Plaintiff filed a reply, asserting that she should not be precluded from raising her "closed period" argument since disability hearings are non-adversarial.   Plaintiff also reiterates that her condition never actually improved at any time between the application date and the date of the ALJ's decision, and that she never claimed it did, but that the ALJ still should have considered whether she was entitled to a closed period of disability.[26]

However, the Court finds that Plaintiff's arguments lack merit.   First, it is evident that the ALJ "considered" whether Plaintiff was entitled to a closed period of disability, contrary to what Plaintiff maintains.   For example, the ALJ expressly found that Plaintiff was never disabled at

---

[26] See, Pl. Reply, ECF No. 11 at p. 2 ("To be sure, Plaintiff did not in her initial brief, nor does she now argue that her condition improved to the point that she was able to work beginning in December 2020. See Pl. Br. 23-26. Plaintiff's argument is that when presented with evidence that strongly supported at minimum a period of disability from her application date of April 9, 2019, through December 7, 2020, when Dr. Wang advised her that she was no longer totally disabled from a physical standpoint, the ALJ should have considered a closed period before denying all disability benefits.")_

any time "since April 4, 2019, the date the [SSI] application was filed." Tr. 24.[27]   Additionally, the ALJ stated that Dr. Simmons' opinion was "mostly persuasive, as restrictions addressed appeared to be standard postoperative restrictions, but [did] not meet the twelve-month durational requirements." Tr. 36.

Also, the Court agrees with Defendant that the ALJ was not bound by the opinion of Dr. Simmons, that Plaintiff would be disabled from working until he said otherwise.   Instead, as discussed earlier, the ALJ was entitled to make a determination based on the record as a whole. *See, Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (Stating that where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required.") (citations omitted).   The Court also agrees with Defendant that there was no obvious gap in the evidence that required the ALJ to develop the record by obtaining a further medical opinion.

Further, the Court agrees with Defendant that the ALJ's finding, that Plaintiff was not disabled for a continuous period of twelve months at any time during the relevant period, is supported by substantial evidence.[28]   This includes the opinions of two agency review

---

[27] *See, e.g., David G. v. Comm'r of Soc. Sec.*, No. 20-CV-302, 2021 WL 2566756, at *6 (W.D.N.Y. June 23, 2021) ("[T]he ALJ clearly considered and rejected the idea that Plaintiff was disabled during the proposed period. In his decision, the ALJ explicitly states Plaintiff "has not been under a disability, as defined by the Social Security Act, since November 16, 2016." This necessarily includes the relevant time frame to which Plaintiff refers.").

[28] *See, Jason M. v. Comm'r of Soc. Sec.*, No. 1:19-CV-0091, 2021 WL 1022441, at *4 (W.D.N.Y. Mar. 17, 2021) ("In arguing the ALJ committed legal error in failing to consider a closed period based on the evidence in the record, Plaintiff is actually arguing substantial evidence [does not support] a finding of disability.") (citation omitted); *see also, Freddie R. v. Saul*, No. 3:18-CV-907 (CFH), 2019 WL 4736464, at *6 (N.D.N.Y. Sept. 27, 2019) ("[B]ecause there is substantial evidence indicating that [plaintiff] was not disabled during any period, the ALJ was correct not to consider a closed period of benefits.") (citation omitted).

physicians, dated less than year after Plaintiff's back surgery, on July 18, 2019, and October 25, 2019, respectively, "that the claimant is able to perform light exertional work activities" with additional postural limitations, which the ALJ found to be "generally persuasive, consistent with the record and supported by other opinion evidence." Tr. 37.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 7) for judgment on the pleadings is denied, Defendant's cross-motion (ECF No. 10) for the same relief is granted, and the action is dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
       March 26, 2024

ENTER:

CHARLES J. SIRAGUSA
United States District Judge